**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| DWAYNE M HERBERT,<br><br>                 Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                 Defendant. | CASE NO. 1:22-CV-00533-JG<br><br>DISTRICT JUDGE JAMES GWIN<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Dwayne Herbert ("Plaintiff" or "Mr. Herbert") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should: (1) ensure that every reasonable effort is made to obtain complete and updated medical records for the entire alleged disability period; (2) consider the complete evidentiary record; and (3) articulate a clear and accurate explanation for her findings as to the weight given to the medical opinion evidence, the assessment of Mr. Herbert's subjective complaints, and the RFC adopted in the decision.

1

# I.      Procedural History

Mr. Herbert filed an application for DIB on June 12, 2014, and an application for SSI on June 19, 2014.  (Tr. 190-92, 343.)  He alleged a disability onset date of December 31, 2013.  (*Id.*) He alleged disability due to acute myocardial infarction, chronic pulmonary insufficiency (COPD) and chronic ischemic heart disease.  (*Id.*)  Mr. Herbert's application was denied at the initial level (Tr. 112) and upon reconsideration (Tr. 194-206) and he requested a hearing before an Administrative Law Judge ("ALJ"), held on July 29, 2016 (Tr. 237, 121-87).

On April 27, 2017, the ALJ issued a decision finding Mr. Herbert had not been under a disability within the meaning of the Social Security Act from December 31, 2013 through the date of the decision ("2017 ALJ Decision").  (Tr. 207-18.)  In doing so, she gave great weight to the opinions of the state agency medical consultants and found Mr. Herbert capable of performing light exertional work with certain additional limitations.  (Tr. 214-16.)

On June 28, 2018, the Appeals Council remanded the 2017 ALJ Decision for resolution of three issues: (1) the ALJ was required under HALLEX I-2-7-30 to grant Mr. Herbert's request for a supplemental hearing after the ALJ proffered post-hearing evidence; (2) the ALJ's RFC had provided for "no exposure to hazards," which could be interpreted as preclusive of all work because of its lack of specificity; and (3) the decision did not adequately evaluate Mr. Herbert's subjective complaints pursuant to Social Security Ruling 16-3p.  (Tr. 219-22.)

The ALJ held a second hearing on April 3, 2019.  (Tr. 68-120.)  She issued another decision on May 9, 2019, again finding Mr. Herbert was not under a disability within the meaning of the Social Security Act from December 31, 2013 through the date of the decision ("2019 ALJ Decision").  (Tr. 46-67.)  This time, in contrast to the 2017 ALJ Decision, the ALJ gave little weight to the opinions of the state agency medical consultants and found Mr. Herbert

capable of performing medium exertional work with certain additional limitations, and not limited to performing light work.  (Tr. 53-59.)  The Appeals Council affirmed the decision, making the 2019 ALJ Decision the final decision of the Commissioner.  (Tr. 1-6.)

On April 4, 2022, Mr. Herbert filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have fully briefed the case.  (ECF Docs. 9, 11, 13.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Herbert was born in 1964 and was 49 years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date. (Tr. 194.)  In June 2014, Mr. Herbert changed age category to become a person closely approaching advanced age.  (*Id*.)  In June 2019, Mr. Herbert changed age category to become a person of advanced age.  (*Id.*)

Mr. Herbert has at least a high school education.  (*Id*.)  He engaged in substantial gainful activity from October 2015 through August 2016, and from October 2017 through February 2018.  (Tr. 51.)  Although Mr. Herbert engaged in substantial gainful activity after the alleged onset date, there was a continuous 12-month period during which he did not work.  (Tr. 52, 60.)

### B.      Medical Evidence

#### 1.      Relevant Treatment History

##### i.      Evidence Considered in 2017 ALJ Decision

Mr. Herbert was seen in the emergency room on June 13, 2014 for congestion and flu-like symptoms including nausea, vomiting, and body aches; he reported onset days before.  (Tr. 460-71.)  His physical exam noted mild decreased air movement but was otherwise normal.  (Tr. 461.)  He was diagnosed with bronchitis, prescribed an inhaler, and discharged.  (Tr. 461-63.)

He returned to the emergency room four days later, on June 17, 2014, complaining of chest pain and pressure while he worked on a construction site.  (Tr. 447.)  He also reported similar symptoms off-and-on for a few weeks prior, resolving with rest.  (*Id.*)  He did not report a significant cardiac history but told providers he smoked one pack of cigarettes per day, down from two packs per day.  (*Id.*)  His EKG showed diffuse ST-T wave changes in the inferior leads, consistent with acute ischemia.  (*Id.*)  He was admitted and cardiologist Ismail Ahmed, M.D., determined that he had acute coronary syndrome and possibly non-ST elevation myocardial infarction.  (Tr. 447-48.)  Dr. Ahmed ordered a transfer for cardiac catheterization.  (*Id.*)

Mr. Herbert underwent a cardiac catheterization with stent placement.  (Tr. 521-25, 581-85, 595-99.)  Findings revealed a 90% lesion of the right coronary artery, but with stenosis reduced to 0% upon deployment of the stent.  (Tr. 516, 522.)  He was discharged on June 18, 2014, with diagnoses of coronary artery disease ("CAD"), status post (s/p) percutaneous coronary intervention of the right coronary artery, hypertension, dyslipidemia, and tobacco abuse.  (Tr. 516.)  His ejection fraction was normal, estimated at 60%.  (Tr. 516, 526-27, 589-90.)  He was prescribed daily aspirin, Effient, Toprol, Lipitor, lisinopril, and nitroglycerin as needed, and advised to follow up in two weeks.  (Tr. 517.)

Mr. Herbert followed up with Dr. Ahmed on August 11, 2014.  (Tr. 551-53, 576-79.)  He complained of shortness of breath, chest pain, and palpitations, but his physical examination findings were normal.  (Tr. 552, 577-78.)  He was diagnosed with Non-ST elevation MI ("NSTEMI"), hypertension, and tobacco abuse.  (Tr. 552, 578.)  He reported cutting his smoking from two packs per day to one pack per day.  (Tr. 552, 579.)  He also reported no angina and that he was back to work.  (*Id.*)  Dr. Ahmed increased his Toprol, added Ambien, and advised him to return in four weeks.  (*Id.*)

4

Mr. Herbert returned to Dr. Ahmed on September 8, 2014, complaining of chest pressure, shortness of breath, and heart palpitations.  (Tr. 548-50, 553, 572-75.)  His physical examination was normal, except that his blood pressure was 182/100 and his heart rate was 120 beats per minute.  (Tr. 549, 574.)  He was diagnosed with CAD s/p percutaneous coronary angioplasty, hypertension, tobacco abuse, and NSTEMI.  (*Id.*)  Dr. Ahmed noted that he had a heart attack four to six weeks before, but still smoked.  (Tr. 550, 575.)  He prescribed Chantix for smoking cessation, increased Toprol, and added hydrochlorothiazide ("HCTZ").  (*Id.*)  Dr. Ahmed also noted Mr. Herbert's blood pressure was high and advised him to return in two weeks.  (*Id.*)

Mr. Herbert returned to see Dr. Ahmed on September 29, 2014, complaining of shortness of breath.  (Tr. 544-47, 568-71.)  His physical examination findings were normal.  (Tr. 545, 570.)  He was diagnosed with congestive heart failure ("CHF"), hypertension, tobacco abuse, and CAD s/p percutaneous coronary angioplasty.  (Tr. 546, 570-71.)  Dr. Ahmed noted that Mr. Herbert had moderate shortness of breath despite reducing smoking from two packs per day to two to three cigarettes per day.  (*Id.*)  He noted Mr. Herbert was doing manual labor, ordered an echocardiogram, and advised Mr. Herbert to follow up in three weeks.  (*Id.*)

Mr. Herbert did not return to see Dr. Ahmed for over a year.  A June 4, 2015 pulmonary function test revealed that he had moderate chronic obstructive pulmonary disease ("COPD").  (Tr. 563.)  Mr. Herbert returned to Dr. Ahmed on November 2, 2015, complaining of dyspnea on exertion and shortness of breath.  (Tr. 565-67.)  His physical examination was normal except that his blood pressure was 180/90.  (Tr. 566-67.)  Dr. Ahmed observed that he smoked only a few cigarettes per day and had no angina.  (Tr. 567.)  However, he was drinking a lot and had high blood pressure.  (*Id.*)  Dr. Ahmed diagnosed hypertension and CAD s/p percutaneous coronary angioplasty, made medication changes, and advised Mr. Herbert to return in three weeks.  (*Id.*)

Mr. Herbert testified at his July 2016 disability hearing that he lost his health insurance in September 2015 because he took a full-time job.  (Tr. 137, 157-59.)  He reported that his doctor would not see him for follow-up on his heart condition unless he paid in cash, so he stopped seeing his doctor.  (Tr. 158-59.)  There are no further medical records in evidence prior to the ALJ's initial disability decision in April 2017.

### ii. Additional Evidence Considered in 2019 ALJ Decision

Mr. Herbert reports that his counsel had difficulty determining what medical records were needed to complete the file before the second hearing because the paper file was not available electronically.  (ECF Doc. 9, p. 3.)  SSA staff advised his counsel that he could travel to the hearing office to review the file in person.  (Tr. 330.)  Counsel evidently did not travel to the office review the file in person prior to the second hearing; nevertheless, he did submit new medical records.  (Tr. 330, 608-1232.)  The ALJ and SSA staff did not apparently make any inquiries in advance of the second hearing to determine what, if any, medical treatment Mr. Herbert had received since his first disability hearing.  Counsel reports in the present briefing that he does not know if additional medical records from 2014 to 2018 exist.  (ECF Doc. 9, p. 3.)

On May 4, 2018, Mr. Herbert was admitted to the hospital with a diagnosis of acute respiratory failure with hypoxia.  (Tr. 608, 619.)  He was reportedly "found down after running from police," and was combative.  (Tr. 609.)  He was intubated for combativeness with ketamine, etomidate, and was given Ativan, Versed, and fentanyl.  (*Id.*)  On examination, he was grey, mottled, and agitated, had blood on his face and right hand, and withdrew all extremities due to pain.  (*Id.*)  He was "profoundly hypoxic" upon arrival but had improved coloration and decreased mottling with resuscitation.  (Tr. 610.)  Imaging of the head, spine, pelvis, and chest

revealed no acute injuries.  (*Id.*)  Providers noted bilateral lower lobe consolidation, suspect aspiration, and concern for a cardiac cause.  (*Id.*)

Mr. Herbert was admitted to intensive care due to hypoxemic and hypercapnic respiratory failure, and was placed on mechanical ventilation.  (Tr. 611.)  On May 5, 2018, Andrea Bell, D.O., opined that Mr. Herbert had an episode of hypotension during the trauma of his fall which resulted in an NSTEMI, developing into acute on chronic hypoxemic and hypercapneic respiratory failure.  (Tr. 617.)  Dr. Bell's assessments included: respiratory failure in a patient with COPD and panlobular emphysema; syncope due to a vasovagal or cardiogenic cause vs. mechanical fall while running; NSTEMI in patient with history of CAD s/p PCI and possible dilated cardiomyopathy; shock; transaminitis, possibly shock liver; elevated CK; and hematuria and BRBR in setting of heparin drip with history of alcohol abuse.  (Tr. 617-18.)  A May 5, 2018 echocardiogram revealed a left ventricular ejection fraction ("LVEF") of 30%, segmental wall motion abnormality consistent with proximal LAD or perhaps LM disease, globally abnormal right ventricular ("RV") systolic function, and mild to moderate aortic valve regurgitation.  (Tr. 640-41, 651-53.)

On May 6, 2018, Mr. Herbert was noted to have Moraxella pneumonia.  (Tr. 641.)  At a May 7, 2018 cardiac consult, Robert S. Finkelhor, M.D., indicated that Mr. Herbert's acute hypoxic respiratory failure was due to aspiration pneumonia, and his NSTEMI was being treated with heparin and ASA.  (Tr. 645.)  He noted that Mr. Herbert had not been taking any medications due to loss of insurance.  (*Id.*)  He diagnosed NSTEMI type I, noted concerning findings in the EKG and echo, continued heparin, ASA and tirofiban, and Lipitor, and started Lopressor.  (Tr. 653.)  He noted that Mr. Herbert needed a cardiac catheterization, but that timing would be important and other issues needed resolution first.  (Tr. 653-54.)

7

Mr. Herbert was extubated on May 9, 2018.  (Tr. 709.)  Dr. Finkelhor's impression was NSTEMI and ischemic cardiomyopathy; he found good indications for catheterization, but continued to be concerned regarding sepsis due to continued fevers.  (*Id.*)  On May 11, 2018, catheterization continued to be delayed due to fevers and rash.  (Tr. 758.)  Mr. Herbert advised providers that he had been off his medications for six months due to lack of insurance, and that he did not remember the robbery or fleeing police.  (Tr. 759.)  He admitted being an alcoholic, but reported that he quit smoking four months before.  (*Id.*)  He reported intermittent "burning" non-radiating right side chest pain at baseline.  (*Id.*)

On May 12, 2018, Mr. Herbert was noted to be disoriented, with altered mental status likely a combination of anoxic encephalopathy and possible sundowning and alcohol withdrawal.  (Tr. 810.)  He repeatedly reported wanting to smoke and drink.  (Tr. 817.)  Catheterization was postponed until his mental and respiratory status improved.  (Tr. 826.)  By May 15, 2018, his mental status was slowly improving but he remained in soft restraints due to pulling on medical devices.  (Tr. 861.)  He was not a candidate for catheterization due to his mental status, with additional concern for medication refusal should stenting be required.  (*Id.*)  Neurology opined that his altered mental status was most likely due to hyperactive delirium.  (Tr. 878.)  He was assessed with encephalopathy and hyperactive delirium.  (Tr. 889.)

Mr. Herbert's altered mental status was noted to be resolved as of May 20, 2018.  (Tr. 919.)  On May 21, 2018, he underwent a left heart catheterization with coronary angiograms, which revealed normal coronary arteries and required no intervention.  (Tr. 925, 976-77, 986-88, 991-93.)  Preparations were made for Mr. Herbert's discharge, complicated by his homelessness.  (Tr. 945.)  On May 22, 2018, cardiology found him appropriate to discharge from a cardiac standpoint.  (Tr. 965.)  He was diagnosed with NSTEMI secondary to takatsubo cardiomyopathy.

(*Id.*)  He was noted to be free of chest pain but with continued deep T wave inversions.  (*Id.*)  A repeat echocardiogram showed an improved ejection fraction to 50% but some apical and anterior hypokinesia.  (Tr. 965, 976, 1115-17.)  It was noted that he now had medical coverage so should be able to obtain his cardiac medications.  (Tr. 976.)

Mr. Herbert was discharged on May 22, 2018, with the final diagnoses: acute respiratory failure with hypoxia; NSTEMI; ischemic cardiomyopathy; disorientation; prolonged QT interval; myocardiopathy; myocardial infarction type 2; and alcohol abuse.  (Tr. 982.)  His condition was listed as "improved" and his discharge summary noted no restrictions on his activity.  (Tr. 984.)

On July 19, 2018, Mr. Herbert presented to the emergency department with left-side non-radiating chest pain.  (Tr. 1154.)  He admitted to smoking and drinking that night.  (*Id.*)  He was in mild distress but physical examination findings were otherwise normal.  (Tr. 1156-57.)  His chest x-ray showed no acute cardiopulmonary process.  (Tr. 1159.)  His EKG and cardiac enzymes were also unremarkable.  (*Id.*)  He was admitted for further evaluation.  (*Id.*)

On July 20, 2018, it was noted that his ability to give a medical history was limited due to intoxication.  (Tr. 1130.)  His assessment noted chest pain at rest, CAD, COPD, alcohol use disorder, and nicotine dependence.  (Tr. 1133.)  Labs showed mild normocytic anemia and serum alcohol levels of 206.  (*Id.*)  His EKG showed NSR with PVCs and possible LVH and T wave inversions in the anterolateral leads.  (*Id.*)  His assessment included chest pain, hypotension, CAD with MI s/p stents, COPD, alcohol use disorder, and nicotine dependence.  (Tr. 1134.)  An echocardiogram revealed mild concentric LV hypertrophy, normal LVEF, and estimated ejection fraction of 70-75%.  (Tr. 1186-88.)

On August 3, 2018, Mr. Herbert presented to the emergency room complaining of left-side non-radiating chest pain and was admitted.  (Tr. 1147.)  The chest pain arose while walking.

(Tr. 1122.)  He reported smoking one pack of cigarettes per day and drinking six to eight twelve-ounce beers daily.  (*Id.*)  He was non-compliant with medications.  (Tr. 1147.)  He appeared to be in mild distress but his examination findings were otherwise normal.  (Tr. 1124-25, 1149-50.)  His urine screen was positive for cannabinoids.  (Tr. 1126.)  His chest x-ray showed no evidence of acute cardiopulmonary process.  (Tr. 1127.)  He was assessed with left sided chest pain, likely stable angina, alcohol withdrawal, hypertension, COPD, and DVT prophlaxis.  (Tr. 1127, 1129.)  His EKG showed new T wave inversion and q waves.  (Tr. 1129.)  His echocardiogram showed normal LVEF function with an estimated ejection fraction of 70-75%, but abnormal LV diastolic function and mild aortic stenosis.  (Tr. 1184-85.)  A stress test was initiated on August 6, 2018, but Mr. Herbert could not finish the test due to anxiety and claustrophobia, and left the hospital against medical advice (AMA).  (Tr. 1191.)

Mr. Herbert returned to the emergency room the same day, complaining of a near syncopal episode after drinking.  (Tr. 1141.)  He was readmitted and cardiology continued its workup for possible acute coronary syndrome (ACS).  (Tr. 1135.)  His physical examination, chest x-ray, and EKG were normal.  (Tr. 1138, 1143, 1145.)  His echocardiogram showed abnormal LV diastolic function with an ejection fraction (EF) of 70-75%.  (Tr. 1140.)  His stress test revealed no stress-induced ischemia or scar and a normal LVEF.  (Tr. 1174.)  He was discharged on August 9, 2018 with the principal diagnosis of chest pain, non cardiac.  (Tr. 1193.)

On August 27, 2018, Mr. Herbert reported to the emergency room, complaining of acute back pain.  (Tr. 1201.)  Physical examination demonstrated tenderness to palpation in the lumbar spine, 3-4/5 muscle strength with right foot dorsiflexion, positive right straight leg, and decreased sensation to the right lateral leg and right big toe.  (Tr. 1202.)  An MRI of his lumbar

spine showed bulging intervertebral disc with canal stenosis and right-sided lateral recess and neural foraminal stenosis at L4/L5.  (Tr. 1207.)

He returned to the emergency room on September 4, 2018 via emergency medical services, complaining of back pain that started in the right knee and went to his lower back.  (Tr. 1215.)  He said he was told he needed surgery for his back but could not follow up with neurosurgery since his car broke down.  (Tr. 1217.)  On examination, he exhibited decreased range of motion, tenderness, pain, and spasm in the lumbar spine.  (Tr. 1219.)  He was placed on extended prednisone taper, lidocaine gel, Norflex, and Toradol for back pain.  (Tr. 1220.)

## 2. Opinion Evidence

### i. State Agency Reviewers

On October 21, 2014, state agency physician Anton Freihofner, M.D., reviewed Mr. Herbert's medical records and opined that he could perform light exertional work, but could never climb ladders, ropes, or scaffolds.  (Tr. 600-02.)  He found no manipulative, visual, communicative, or environmental limitations were established.  (Tr. 603-04.)  In support of his opinion, Dr. Freihofner considered the findings from Mr. Herbert's June 2014 hospitalization for a heart attack with cardiac stenting.  (Tr. 607.)  He noted that Mr. Herbert tolerated the stent procedure well, with 0% stenosis upon deployment of the stent, denied chest pain, and had a normal ejection fraction in his June 2014 echocardiogram.  (*Id.*)  He also noted normal physical examination findings in Mr. Herbert's physical examination at his follow up with Dr. Ahmed on September 29, 2014.  (*Id.*)  He indicated that that Mr. Herbert's statements were partially credible and he had a history of myocardial infarction, but indicated that the medical records did not document severe breathing issues to support allegations of COPD.  (Tr. 605.)

On June 29, 2015, state agency physician Maureen Gallagher, D.O., reviewed Mr. Herbert's medical records at the reconsideration level, which included the June 2015 pulmonary function study.  (Tr. 202-04.)  Dr. Gallagher affirmed Dr. Freihofner's findings but added that Mr. Herbert could frequently climb ramps and stairs.  (Tr. 202-03.)  Dr. Gallagher also indicated that Mr. Herbert should avoid concentrated exposure to cold, heat, irritants, and poor ventilation, and avoid all exposure to hazards such as unprotected heights.  (Tr. 204.)  In support of the postural and environmental limitations, Dr. Gallagher referred to Mr. Herbert's stent placement status post myocardial infarction, emphysema, and moderate COPD.  (Tr. 203-04.)  Dr. Gallagher found Mr. Herbert's symptoms could reasonably be attributed to his medically determinable impairments, noting that he experienced some shortness of breath due to his heart condition and emphysema.  (Tr. 202.)  Nevertheless, she noted that his physical examinations had all been normal, he had a stent placed, and his pulmonary function testing was in the lower-limits of normal.  (*Id.*)  In light of that evidence, she concluded that he appeared more capable than his activities of daily living would indicate.  (*Id.*)

## C.    Hearing Testimony

### 1.    Plaintiff's 2016 Hearing Testimony

On July 29, 2016, Mr. Herbert testified at a hearing before the ALJ.  (Tr. 121-87.)  Mr. Herbert testified to having COPD, carrying an inhaler, and getting short of breath.  (Tr. 131.)  He was living in a two-story duplex with his wife.  (Tr. 131-32.)  He had just turned 52 years old at the time of the hearing.  (Tr. 132.)  He did not have a valid driver's license because he had let it lapse two years prior, after his wife was hospitalized for an aneurysm.  (Tr. 133, 135.)

Mr. Herbert was working full-time at Butternut Recycling, Monday through Friday from 8:00 a.m. through 5:00 p.m. and Saturday from 8:00 a.m. to 12:00 p.m.; he was making $12 per

hour. (Tr. 137-38.) He operated the cutting torches and cut the transmissions off of the motors. (Tr. 138.) The job was labor intensive and required a lot of standing and walking. (Tr. 139.) It did not require much lifting or carrying, but he was required to push or pull at least 50 pounds and sometimes 100 pounds using grab bars. (Tr. 140.) Mr. Herbert had also worked at Alco Manufacturing for four or five months. (Tr. 141.) He was required to push, pull, and lift bins of parts that weighed 50 pounds. (*Id.*) Mr. Herbert testified that much of his past work over the previous fifteen years was manual labor, such as subcontracting work where he was lifting gutters, shingles, and windows. (Tr. 142-44.)

Mr. Herbert testified that he had a heart attack in June 2014 and found it difficult to continue working thereafter. (Tr. 150.) He attempted to work at Alco Manufacturing and Butternut Recycling, but was unable to sustain the type of manual labor required for those jobs. (Tr. 150-52.) He required additional assistance and supervision from his coworkers to complete his work. (Tr. 152.)

Mr. Herbert was on blood thinners due to his heart condition. (Tr. 153-54.) He was also often short of breath and would have chest pains, causing him concern for another heart attack. (Tr. 154.) His chest pains were unpredictable and would come and go. (Tr. 169.) He testified to experiencing worsening chest pains and more frequent periods in which he had shortness of breath. (Tr. 155-56.) After his heart attack, he had a stent placed. (Tr. 155.) He indicated he was not able to continue treatment for his heart because he lost his health insurance after taking the job at Butternut Recycling. (Tr. 158-59.) At his last visit with his cardiologist in 2015, Mr. Herbert's medication was adjusted, but no other procedures were recommended. (Tr. 160.) Mr. Herbert testified that his cardiologist had warned that he may need to have two or three stents placed if he were to continue with labor-intensive work. (Tr. 167.)

13

He testified that he used an inhaler for his COPD.  (Tr. 161.)  While he was at work, he used his inhaler once per hour; he also needed to use his inhaler after climbing stairs.  (*Id.*)  Mr. Herbert did not do chores around the house, other than sweeping; he was no longer able to mow the yard and his neighbor did it for him.  (Tr. 163-66.)  His stomach was upset with the number of medications he needed to take for his conditions.  (Tr. 175.)

Mr. Herbert had missed 21 days of work between February and July of that year due to his health conditions.  (Tr. 170.)  He testified that the owner wanted to fire him, but that he was friends with his manager, who advocated to give him a second chance.  (Tr. 170-71.)  Mr. Herbert also testified that he took eight or ten five-minute breaks in addition to his regularly scheduled break periods.  (Tr. 171.)  He reported that he had no work experience that did not require intensive physical labor.  (Tr. 175.)

### 2.    Plaintiff's 2019 Hearing Testimony

At the hearing on April 3, 2019, Mr. Herbert testified that he was living in a van with his wife.  (Tr. 75-76.)  He had a state-issued ID but no driver's license and did not drive.  (*Id.*)  He received some food stamps, but had no other income.  (Tr. 87.)  He had completed high school. (Tr. 75.)  Previously, Mr. Herbert had worked full-time at Butternut Recycling, in which he used a cutting torch to break down cars for recycling.  (Tr. 76-77.)  He used the cutting torch to cut bolts and separate the transmission from the motor of a car, but needed to pause after every bolt because the cutting torch's weight (three or four pounds) became too heavy for him.  (Tr. 79.) In that position, Mr. Herbert was required to lift, push, and pull upwards of 50 pounds.  (Tr. 77.)

Mr. Herbert reported he was fired from Butternut Recycling in September or October of 2016 because he could not do the work anymore and needed assistance from younger coworkers to complete the job.  (Tr. 77-78.)  He then worked briefly at Camaco, inspecting welds on auto

14

seats.  (Tr. 80-81.)  In that position, he was required to stand for the full day but was not required

to lift any weight; he occasionally needed to push boxes on rollers.  (Tr. 81-82.)  He reported that

he was let go from this position because he was not able to do the work.  (Tr. 84-85.)

Mr. Herbert testified he was unable to work because he ended up in the hospital every

time he attempted to exert himself.  (Tr. 87.)  He also said his COPD and back pain limited him

to walking only a half a block.  (Tr. 91.)  During one incident walking to the store, he reported

his back pain went through his leg and he fell on the sidewalk; his wife took him to the

emergency room.  (*Id.*)  An MRI from that ER visit indicated a herniated disc.  (Tr. 92.)

Mr. Herbert reported that he attempted medication management and physical therapy for

his pain, which he described as an "arthritis-type pain."  (Tr. 93, 106.)  He could not sit with his

back straight, and instead had to sit forward and lean on his elbows to reduce discomfort.  (Tr.

109.)  He reported being on blood thinners and blood pressure medication for his heart condition

(Tr. 94), but said he was not always compliant with his medication because of his living situation

and because they upset his stomach (Tr. 101-02).  He reported using an inhaler ten to twelve

times per day for his COPD, and that no other treatments are available.  (Tr. 98.)  He testified to

smoking almost a pack a day, saying he tried to quit but was not able to.  (Tr. 102.)

### 3.    Vocational Expert's 2019 Hearing Testimony

A Vocational Expert ("VE") testified at the 2019 hearing.  (Tr. 88-90, 111-17.)  In her

first hypothetical, the ALJ asked the VE if any jobs would be available to an individual of Mr.

Herbert's age, education, and work experience who had the following residual functional

capacity: able to perform medium work; can frequently climb ramps and stairs; can never climb

ladders, ropes, or scaffolds; can be exposed frequently to extreme heat, extreme cold, fumes,

odors, dust, gases, and poor ventilation; can never be exposed to hazards such as unprotected

heights. (Tr. 112.) The VE testified that such a hypothetical individual could not perform Mr. Herbert's past work, and that there would be no transferable skills from Mr. Herbert's past work. (Tr. 113.) However, such an individual could perform representative positions in the national economy at the medium exertional level, including janitor, hand packager, and busser. (*Id*.)

In her second hypothetical, the ALJ asked if there would be any jobs available if an individual with the same abilities and limitations as the first hypothetical was able to perform light exertional work but not medium work. (*Id*.) The VE opined that such an individual could perform representative positions in the national economy at the light exertional level, including mail sorter, price marker, and cleaner, housekeeping. (Tr. 113-14.) The VE also testified that that it would preclude competitive employment if the person would be off task ten percent or more of the workday or absent more than one day per month. (Tr. 115-17.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In her May 9, 2019 decision, the ALJ made the following findings:[1]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.  (Tr. 51.)

2.      The claimant engaged in substantial gainful activity during the following periods: October 2015 to August 2016 and October 2017 to February 2018. (*Id*.)

---

[1] The ALJ's findings are summarized.

3.      However, there has been a continuous 12-month period during which the
        claimant did not engage in substantial gainful activity.  (Tr. 52.)

4.      The claimant has the following severe impairments: emphysema,
        congestive heart failure, coronary artery disease, and hypertension.  (*Id.*)

5.      The claimant does not have an impairment or combination of impairments
        that meets or medically equals the severity of the listed impairments in 20
        C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 53.)

6.      The claimant has the residual functional capacity to perform medium work
        as defined in 20 CFR 404.1567(a) and 416.967(a) except: frequent
        climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds'
        frequent exposure to extreme heat, extreme cold, fumes, odors, dusts,
        gases, and poor ventilation; and no exposure to unprotected heights.  (*Id.*)

7.      The claimant is unable to perform any past relevant work.  (Tr. 59.)

8.      The claimant was born in 1964 and was 49 years old, defined as a younger
        individual age 18-49, on the alleged disability onset date. The claimant
        subsequently changed age category to closely approaching advanced age.
        (*Id.*)

9.      The claimant has at least a high school education.  (*Id.*)

10.     Transferability of job skills is not material to the determination of
        disability.  (*Id.*)

11.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform.  (*Id.*)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability,

as defined in the Social Security Act, from December 31, 2013, through the date of the decision

on May 9, 2019  (Tr. 60.)

## V.      Plaintiff's Arguments

Mr. Herbert presents the following arguments for review:

1.  There is no substantial evidence to support a finding that Mr. Herbert can
    perform medium work;

18

2. Substantial evidence supports that Mr. Herbert's RFC was at light work at the beginning of his application in 2014 and subsequently changed to sedentary work in 2015 or 2016;

3. The ALJ is not permitted to disregard Mr. Herbert's testimony regarding the intensity, persistence, and limiting effects of his symptoms just because the medical evidence does not always squarely substantiate them;

4. The ALJ wrongly discounted Mr. Herbert's testimony due to his continued smoking without substantial evidence to support improvement of his condition should he quit smoking; and

5. The ALJ overly relied on a doctor's discharge statement that Mr. Herbert had "no restrictions" to the exclusion of much greater medical evidence to the contrary.

(ECF Doc. 9, pp. 1-2.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

19

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **First, Second, and Fifth Assignments of Error: Whether Substantial Evidence Supported ALJ's RFC Determination.**

Mr. Herbert offers numerous arguments to the effect that the medium RFC adopted in the 2019 ALJ Decision was not supported by substantial evidence.  First, he argues "[t]here is no substantial evidence to support a finding that [Mr.] Herbert can perform medium work."  (ECF Doc. 9, p. 1.)  In support, he notes that the state agency medical consultants limited him to light

work, which the ALJ agreed with and gave great weight in the remanded 2017 ALJ Decision. (*Id.* at pp. 11-13.)  He argues the ALJ's change from a light RFC in 2017 to a medium RFC in 2019 was not supported by substantial evidence, and was harmful because he would have been disabled under the medical vocational rules one month after the 2019 ALJ Decision if he was limited to light work.  (*Id.* at p. 13.)  In this same vein, he argues the ALJ relied too heavily on a discharge note of "no restrictions" to the exclusion of "much greater medical evidence to the contrary."  (*Id.* at pp. 2, 16.)  Mr. Herbert additionally argues "substantial evidence indicates" his functional capacity declined in 2015 or 2016 to an ability to perform only sedentary work, which would have disabled him under the medical vocational rules at that time.  (*Id.* at pp. 1, 12.)

The Commissioner argues in opposition that the ALJ appropriately considered the medical and nonmedical evidence – including Mr. Herbert's allegations, the treatment records, and the medical opinions – and reasonably determined that Mr. Herbert could perform a limited range of medium work.  (ECF Doc. 11, pp. 8-10.)  The Commissioner notes that the RFC from the 2017 ALJ Decision was not binding on the ALJ after remand, and the ALJ may consider the claim and supporting evidence *de novo*.  (*Id.* at pp. 10-11.)  She argues the ALJ appropriately explained in the 2019 ALJ Decision why she did not adopt the opinions of the state agency medical consultants, and that he was not required to adopt them.  (*Id.* at 10-12.)  She finally argues that the ALJ was not required to accept Mr. Herbert's subjective testimony that he was limited to performing sedentary exertional work.  (*Id.* at pp. 12-13.)

For the reasons set forth below, the undersigned concludes that the ALJ lacked substantial evidence to support the weight she gave to the medical opinions and the medium RFC she adopted because the failed to "build an accurate and logical bridge" between the evidence and her opinion and RFC findings.  The undersigned recommends remand on that basis.

21

### 1.       Whether ALJ Erred in Evaluating State Agency Medical Opinions

The applicable regulations establish a hierarchy for evaluating medical opinions, with well-supported treating source opinions entitled to controlling weight, *see* 20 C.F.R. § 404.1527(c)(2), and opinions by examining but non-treating medical sources given more weight than non-examining medical source opinions, *see* 20 C.F.R. § 404.1527(c)(1).  Where there is not a treating source opinion, ALJs must "evaluate all medical opinions" using the factors set forth in 20 C.F.R. § 416.927(c), including: length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairments.  *See Walton v. Comm'r of Soc. Sec.*, No. 97–2030, 1999 WL 506979, at *2 (6th Cir. June 7, 1999).

Here, the only medical opinions in evidence are the non-examining opinions of state agency medical consultants Dr. Freihofner and Dr. Gallagher, who both found Mr. Herbert to be capable of light exertional work with certain additional limitations.  (Tr. 202-04, 600-607.)  Dr. Freihofner based his opinion on a review of hospital records from Mr. Herbert's first heart attack and cardiac catheterization with stenting in 2014, and the follow-up findings by cardiologist Dr. Ahmed in September 2014.  (Tr. 605-07.)  Dr. Gallagher based her opinion on the same records, as well as pulmonary function test findings from 2015 reflecting that Mr. Herbert had moderate COPD.  (Tr. 202-04.)

 In the vacated 2017 ALJ Decision, the ALJ gave those opinions "great weight" and adopted a light RFC, explaining that the opinions "are consistent with the objective medical evidence, clinical findings on examination, and course of treatment."  (Tr. 216.)  However, in the final decision in 2019, the ALJ gave the same opinions "little weight" as to exertional limitations and adopted a medium RFC.  (Tr. 53, 58.)  She explained:

> I give little weight to their opinion of light exertional work because <u>it is not supported by the objective medical evidence</u> including the unremarkable physical examinations and the claimant's ejection fractions ranging from 50 to 75. Their opinion of light exertional work is <u>not consistent with the limited course of treatment and gaps in treatment</u>. In addition, <u>no treating doctor, including cardiologist, indicated any work or activity restrictions for the claimant</u>. Instead, I find the claimant retains the ability to perform medium exertional work with the postural and environmental limitations as set forth above. This is also supported by the <u>claimant's ability to return to medium work (or heavier) for several months</u> after the State Agency reviewed his case.

(Tr. 58 (emphasis added).)

Mr. Herbert argues the ALJ's finding that he could perform medium work was arbitrary given her prior finding in 2017 that he could perform light work, and considering the worsening of his condition since 2017. (ECF Doc. 9, p. 13.) The Commissioner responds that the 2017 RFC was vacated and has no binding effect, that the ALJ adequately explained the basis for her less restrictive RFC in 2019, and that the ALJ was not bound to adopt the opinion findings of the state agency medical consultants. (ECF Doc. 11, p. 10-12.)

The Commissioner is correct that "a decision vacated by the Appeals Council has no *res judicata* effect." *Williams v. Astrue*, No. 3:10CV2354, 2012 WL 892544, at *6 (N.D. Ohio Mar. 14, 2012); *see also Wireman v. Comm'r of Soc. Sec.*, 60 F. App'x 570, 571 (6th Cir. 2003) (finding contention that ALJ was bound by findings in a prior vacated decision to be meritless). The Commissioner is also correct that ALJs "are not bound by findings made by State agency or other program physicians and psychologists." *White v. Comm'r of Soc. Sec. Admin.*, 970 F. Supp. 2d 733, 761 (N.D. Ohio 2013) (quoting SSR 96–6p, 1996 WL 374180, *2 (Jul. 2, 1996)).

Nevertheless, ALJs "must explain the weight given to the opinions [of State agency physicians and psychologists] in their decisions." *Id.* ALJs also may not selectively highlight certain facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing

where ALJ failed "to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications"); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (reversing where ALJ's finding that claimant "suffered no limitations was a clear mischaracterization of the facts").

Here, the ALJ did weigh the opinions of the state agency doctors and explain how the regulatory factors supported that weight. She gave "little weight" to the opinions limiting Mr. Herbert to light work, explaining that she found they were not supported by objective medical findings or treating medical opinions and were not consistent with his treatment and work history. (Tr. 58.) On its face, this explanation appears to meet the regulatory standard. However, a closer examination reveals inaccuracies and logical gaps that preclude a finding that substantial evidence supported the assignment of "little weight" to the medical opinions.

First, the ALJ found the state agency medical opinions were "not supported by the medical evidence including the unremarkable physical examinations and [Mr. Herbert]'s ejection fractions (EF) ranging from 50[%] to 75[%]." (*Id.*) But the state agency doctors had based their opinions on similar findings in the 2014 medical records, including an EF of 60% and unremarkable physical exams. (Tr. 201, 203, 607.) At that time, Mr. Herbert had suffered a heart attack with a 90% blockage that resolved with stenting, and his follow-up appointments showing continued symptoms but normal exam findings and a normal EF.

By the time of the 2019 ALJ Decision, Mr. Herbert had suffered a second heart attack, this time with acute respiratory failure and a three-week hospitalization. (Tr. 982-84.) Although the ALJ accurately observed that objective medical findings from Mr. Herbert's hospital visits in

24

2019 included normal physical exams and normal EF, she failed to clearly acknowledge that (1) the opinions she gave "little weight" were also based on normal physical exams and normal EF findings following Mr. Herbert's first heart attack and (2) Mr. Herbert had since suffered a second heart attack. Indeed, there is no mention of Mr. Herbert's second heart attack in the ALJ's discussion of her finding that Mr. Herbert had fewer exertional limitations after a second heart attack than those assigned by doctors following his first heart attack.

Of course, an ALJ may rely on previously articulated information in support of her opinion discussion. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). But a review of the whole decision does not demonstrate that the ALJ acknowledged the significance of the second heart attack. Although she discussed Mr. Herbert's 2018 hospitalization three different times – mentioning each time that he suffered trauma while fleeing the police and was released with "no restrictions" – the ALJ made only one reference to the fact that he had had another heart attack, when she listed his diagnoses as "acute hypoxic respiratory failure, lactic acidosis, and T1 NSTEMI"; otherwise she described the hospitalization as an admission with "a primary diagnosis of acute respiratory failure with hypoaxia [*sic*]" and a "hospitalization . . . for 21 days in the context of falling down while fleeing from the police." (Tr. 56-58.) One mention of the diagnosis "T1 NSTEMI" is insufficient to show that the ALJ acknowledged and considered the significance of Mr. Herbert's second heart attack when she concluded that he had even fewer physical limitations than those assigned by state agency reviewing doctors after his first heart attack.

The other factors articulated by the ALJ in support of the "little weight" she gave to the state agency opinions do not resolve the shortcomings identified above. While a "limited course

of treatment and gaps in treatment" (Tr. 58) are relevant considerations, that descriptive language does not accurately account for the fact that the "limited course of treatment" at issue here is not simply a series of sporadic follow-up treatment visits, but includes a three-week hospitalization for a second heart attack with acute respiratory failure.

The ALJ's additional observation that "no treating doctor, including cardiologist, indicated any work or activity restrictions for the claimant" (*id.*) is also misleading.  While the opinion of an examining medical source is given more weight than a non-examining medical source, *see* 20 C.F.R. § 416.927(c)(1), the only medical opinions in evidence here are those of the state agency doctors.  Although the ALJ repeatedly references hospital discharge paperwork which notes "no restrictions" (Tr. 56-58), she does not argue that the brief notation is a medical opinion entitled to weight in determining the RFC and does not weigh it as such.  (Tr. 58-59). That is consistent with the regulatory standard.  *See* 20 C.F.R. § 416.927(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.")  Given that no treating source has offered an opinion as to Mr. Herbert's functional capacity, the ALJ's observation that no such source has "indicated any work or activity restrictions" is of limited significance in comparison to actual medical opinion findings from the state agency doctors.

Finally, the ALJ's observation that Mr. Herbert was able to perform medium work for "several months" during the disability period does not change the analysis.  (Tr. 58.)  As the ALJ recognized, Mr. Herbert acknowledged his attempts to work during the disability period, but complained that he suffered symptoms that interfered with his ability to work and was fired due to his inability to complete the work.  (Tr. 54.)  The ALJ observed that Mr. Herbert's earnings at

Butternut Recycling rose to the level of substantial gainful activity despite testimony that he worked less and was paid less than his coworkers, but also acknowledged his testimony that he got a feeling of a big knot in his chest with "excessive exertion."  (Tr. 57-58.)  Although the ALJ did not include a citation for this reference, a review of the hearing transcripts reveals that Mr. Herbert actually testified that it was "predictable" that he would get "a big knot" in his chest "if I gotta pick up 50 pounds and carry it up to the front of the shop."  (Tr. 168-69.)  Lifting and carrying up to 50 pounds for one third of the workday is a requirement to perform medium exertional work.  *See* 20 C.F.R. § 4041567(c); SSR 83-10, 66 Fed. Reg. 167 (Aug. 28, 2001); POMS DI:25001.001.  Further undermining this finding is the fact that the ALJ previously found Mr. Herbert to be limited to a light RFC in the vacated 2017 ALJ Decision, which was issued with full knowledge and testimony regarding his work for Butternut Recycling.

For the reasons stated above, the undersigned finds the ALJ's reasoning for giving "little weight" to the state agency medical opinions does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  The ALJ did not clearly, accurately, and logically articulate her basis for discounting the only medical opinions of record to conclude that Mr. Herbert has fewer physical limitations following his second heart attack than the state agency doctors assigned following his first heart attack.

### 2. Whether Finding That Mr. Herbert Could Perform Medium Work Was Supported by Substantial Evidence

In addition to challenging the weight given to the medical opinions, Mr. Herbert argues the medium RFC adopted in the 2019 ALJ Decision was not supported by substantial evidence. The Commissioner argues the ALJ appropriately considered the evidence of record, including Mr. Herbert's subjective complaints, the medical treatment records, and the medical opinion evidence, and adopted an RFC supported by substantial evidence.  (ECF Doc. 11, pp. 8-10.)

27

This Court cannot overturn the Commissioner's decision "so long as substantial evidence . . . supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  As noted above, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030.  Nevertheless, this Court must also consider whether the reasons given to support the RFC "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

The undersigned concluded in Section VI.B.1., *supra*, that the ALJ had failed to "build an accurate and logical bridge" to support her finding that the medical opinions limiting Mr. Herbert to light work were entitled to "little weight," finding the ALJ failed to provide an accurate and logical explanation for discounting those opinions.  For similar reasons, the undersigned finds the ALJ failed to provide an accurate and logical explanation for adopting an RFC finding Mr. Herbert able to perform medium exertional work after his second heart attack, despite the medical opinions limiting him to light work following his first heart attack.

The chief failing in the RFC analysis again lies in the explanation offered by the ALJ for giving "little weight" to the medical opinions, but the undersigned also observes the following additional gaps and inaccuracies in the ALJ's discussion of the RFC determination:

- The ALJ highlighted instances of medication non-compliance in finding Mr. Herbert's limitations were not as severe as alleged (Tr. 56-58) without addressing notes in medical records suggesting some noncompliance stemmed from lack of health insurance (*see, e.g.,* Tr. 759 (reported off meds for six months prior to second heart attack due to lack of insurance));

- The ALJ noted gaps in treatment when finding limitations not as severe as alleged (Tr. 56-58) without addressing testimony reflecting the impact of Mr. Herbert's lack of health insurance (Tr. 137, 157-59 (stopped treating with cardiologist because he lost health insurance upon return to full time work)) or the impact of his homelessness (Tr. 75-76, 945) on his continued access to treatment;

28

- The ALJ stated that Mr. Herbert was "not a candidate for invasive cardiovascular testing due to his mental state and likely medication noncompliance" (Tr. 56) when the records said he was not a candidate <u>at that time</u> because of an altered mental status due to hyperactive delirium and encephalopathy, with additional concern for medication refusal, but catheterization was performed once the encephalopathy resolved (Tr. 861, 878-89, 919, 925);

- The ALJ noted Mr. Herbert left the hospital against medical advice (AMA) when scheduled for stress testing (Tr. 56-57) without specifying that his failure to finish the testing was due to anxiety and claustrophobia (Tr. 1191) and that he returned to the hospital on the same day to complete testing (Tr. 1135, 1141); and

- The ALJ found Mr. Herbert's ability to perform medium work for a few months supported a medium RFC (Tr. 58) without addressing his testimony regarding his limitations in performing that work (Tr. 77-79, 150-52, 170-71) and noted Mr. Herbert's complaints of a knot in his chest with "excessive exertion" (Tr. 58) without acknowledging that he testified lifting 50 pounds predictably caused that symptom (Tr. 168-69).

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984)). Here, the undersigned concludes that the ALJ did not fully and accurately discuss the evidence supporting her weighing of the opinion evidence or her assignment of a medium RFC, and therefore failed to "build an accurate and logical bridge" to support those determinations.

For the reasons set forth above, the undersigned recommends that the ALJ decision be vacated and remanded for further proceedings consistent with this decision.

**C.      Third and Fourth Assignments of Error: Whether ALJ Properly Considered Mr. Herbert's Subjective Complaints**

Mr. Herbert further argues in his third and fourth assignments of error that the ALJ erred in considering his subjective complaints under SSR 16-3p, first by improperly disregarding his "statements about the intensity, persistence, and limiting effects of his symptoms" on the basis that they are not squarely substantiated by the medical records, and second by wrongly

discounting his complaints on the basis of his continued cigarette smoking.  (ECF Doc. 9, pp. 1-2.)  The Commissioner responds that the ALJ's assessment of subjective evidence must be given great deference on review, and that the ALJ properly followed SSR 16-3p in articulating her consideration of Mr. Herbert's symptoms.  (ECF Doc. 11, pp. 13-16.)   She also argues that the ALJ appropriately considered Mr. Herbert's continued smoking.  (*Id.* at pp. 16-19.)

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  SSR 16-3p, 82 Fed Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  *Id.* at 49466 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness.") (citing SSR 16-3p), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law using the old terminology.  *See, e.g., Alexander*, 2021 WL 4459700, *14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, *10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5.  These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, 2021 WL 4066985, *5 (E.D. Tenn. Sept.

7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, 2021 WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining that SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

A claimant's subjective statements regarding their symptoms alone are insufficient to establish a disability.  *See* 20 C.F.R. § 404.1529(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to regulations effective March 27, 2017)).  As SSR 16-3p states, the agency "will not find an individual disabled based on alleged symptoms alone."  SSR 16-3p, 81

Fed. Reg. 14166 (March 16, 2016).   Rather, the ALJ is directed to consider Mr. Herbert's

statements, along with the body of evidence available in the record, when determining disability:

> In considering the intensity, persistence, and limiting effects of an individual's
> symptoms, we examine the entire case record, including the objective medical
> evidence; an individual's statements about the intensity, persistence, and limiting
> effects of symptoms; statements and other information provided by medical sources
> and other persons; and any other relevant evidence in the individual's case record.

(*Id.*)

When the Appeals Council remanded the 2017 ALJ Decision, it found that decision did

not contain an adequate evaluation of Mr. Herbert's subjective complaints under SSR 16-3p, and

specifically did not address Mr. Herbert's hearing testimony that his doctor told him he would

need more stents if he continued to work, that his ability to work was limited, and that he had the

feeling of a knot in his chest with excessive exertion.  (Tr. 221.)  In the 2019 ALJ Decision,

accordingly, the ALJ provided a lengthy analysis of Mr. Herbert's subjective complaints

pursuant to SSR 16-3p.  (Tr. 54-58.)  She acknowledged his complaints regarding physical

limitations, but found his allegations "out of proportion to the medical evidence and other

evidence."  (Tr. 54.)  After discussing the medical evidence at length, the ALJ determined that

his symptoms and limitations were "not as severe as alleged" because of factors that included:

- No ER visits or hospitalizations since August 2018 (Tr. 57);

- No frequent care for any medical condition (*id.*);

- Normal physical examinations (*id.*);

- Although he alleges chest pain and shortness of breath, he "has been non-
  compliant with medications at times and he continues to smoke" (*id.*);

- He claims that his doctor told him he would need more stents if he continued
  working, but that is not evident in the medical records (*id.*);

- No doctor, including no cardiologist, said he required work restrictions (*id.*);

- He said he did less work and was paid less than other employees at Butternut, but nevertheless was paid at substantial gainful activity levels (Tr. 57-58);

- He complains of a big knot in his chest with excessive exertion, but has been noncompliant with medication at times, continues to smoke, and has gaps in treatment (Tr. 58);

- He testified to using an inhaler 10-12 times daily, but the medical evidence does not support this contention (*id.*);

- He complains that he ends up at the hospital if he works, but was released to "return to work" within a few days of his stenting in 2014, his hospitalization in May 2018 was "not within the context of working," and his hospitalization in August 2018 was "in the context of medication non-compliance" (*id.*);

- He reports that he was fired from his job at Camaco because he could not keep up with the pace of work, and that he last worked in February 2018, but sought medical treatment for back pain in August 2018 due to "bending underneath a bus at work" (*id.*).

For the most part, this discussion suggests that the ALJ considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.

For example, Mr. Herbert's argument that the ALJ improperly discounted his claims regarding the frequency of his inhaler use is not well taken, as the ALJ merely (and accurately) observed that this level of usage was not reflected in the medical treatment records. (ECF Doc. 9, p. 13.)  Similarly, his argument that the ALJ improperly took issue with his continued smoking is not well taken.  (*Id.*)  The ALJ made that observation in response to Mr. Herbert's own continued complaints of chest pain and shortness of breath (Tr. 57-58), complaints that are incompatible with continued cigarette smoking.  *See Sias v. Sec'y of Health & Hum. Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) ("[W]e can take judicial notice of the massive body of medical opinion supporting the advice the claimant received from his doctor on the subject of cigarette smoking."); *Siler v. Astrue*, No. CIV.A. 11-391-DLB, 2012 WL 2603656, at *7 (E.D. Ky. July 5, 2012) ("The Sixth Circuit has repeatedly held that a claimant's continued smoking militates

33

against the credibility of his disabling breathing [dis]order. Despite Plaintiff's cardiac and

pulmonary troubles, he continued to smoke cigarettes. . . .Thus, Plaintiff's continued smoking up

to 2008 also indicates that Plaintiff's pulmonary impairment is not as severe as he suggests.").

However, Mr. Herbert makes other arguments regarding the ALJ's subjective symptom

analysis which parallel the shortcomings discussed in section VI.B., *supra*.  For example, Mr.

Herbert argues that the ALJ "downplayed his heart and back conditions that landed him in the

hospital in 2018."  (ECF Doc. 9, p. 13.)  He also argues that "the ALJ took issue with [his] non-

compliance with his medication without considering the possible reasons for his non-

compliance," including his complaint that the medications caused stomach upset.  (*Id.* at p. 14.)

As discussed above, the discussion in the 2019 ALJ Decision does not clearly reflect that the

ALJ considered the significance of Mr. Herbert's second heart attack in finding him capable of

medium work, and does not clearly reflect that the ALJ considered evidence that offers some

explanation for certain instances of medication noncompliance or gaps in treatment.

Mr. Herbert also argues that the ALJ's reference to his running from police was "a smear

on [his] character."  (ECF Doc. 9, p. 13.)  The ALJ in that instance was technically responding to

Mr. Herbert's assertion that he could not work without ending up in the hospital, noting that the

hospitalization in question was not the result of a return to work.  (Tr. 58.)  It is nevertheless

observed that the ALJ was very free with references to Mr. Herbert's flight from police,

sometimes at the expense of addressing more relevant medical findings and treatment connected

to the same event, i.e., Mr. Herbert's second heart attack.  It also comes across poorly that the

ALJ used this non-work-related hospitalization to contradict Mr. Herbert's claim that he ends up

in the hospital if he works, and then in the same paragraph discussed his ER visit for back pain

while "bending underneath a bus at work" <u>not</u> as an example to substantiate the same allegation,

but rather as an example to contradict his separate statement that he had stopped working earlier that year due to his impairments.  (Tr. 58.)  Thus, his subjective complaints were discounted both because he was not working and because he was.  Given his testimony that he was attempting to work out of financial necessity (Tr. 147, 151-52) and became homeless after losing that job (Tr. 75-76), this is an inequitable approach to weighing his complaints.

For the reasons stated above, the undersigned finds the ALJ did not fully and accurately discuss the evidence supporting her weighing of Mr. Herbert's subjective complaints and lacked substantial evidence to support her findings because she "failed to build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.

The undersigned accordingly recommends that the ALJ decision be vacated and remanded for further proceedings consistent with this decision.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**.  On remand, the ALJ should: (1) ensure that every reasonable effort is made to obtain complete and updated medical records for the entire alleged disability period; (2) consider the complete evidentiary record; and (3) articulate a clear and accurate explanation for her findings as to the weight given to the medical opinion evidence, the assessment of Mr. Herbert's subjective complaints, and the RFC adopted in the decision.

May 8, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 19, 2023(1985).